UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

HIS HEALING HANDS CHURCH,

       Plaintiff,

v.                                                Case No. 1:15-CV-1059

LANSING HOUSING COMMISSION,        HON. GORDON J. QUIST

       Defendant.
_____/

## OPINION

Plaintiff, His Healing Hands Church (the Church), is a Lansing church affiliated with the Assemblies of God. On Sundays, the Church holds religious meetings that serve residents of public housing developments operated by Defendant, the Lansing Housing Commission (the Housing Commission). The Church previously requested permission to conduct its Sunday religious meetings in the community rooms of two housing developments operated by the Housing Commission. The Housing Commission refused the request on the grounds that it does not allow use of the community rooms for religious activities. The Church filed a complaint asserting that the Housing Commission had violated its rights under the First Amendment and the Equal Protection Clause, and sought a preliminary injunction. Because the Housing Commission's refusal to allow groups to use its community rooms for religious purposes constitutes impermissible viewpoint discrimination, the Court will grant the Church's motion and enter a preliminary injunction.

### *Background*

The Housing Commission is a public housing authority that provides subsidized housing to qualified individuals and families. (Dkt. #15-2 at Page ID#489, ¶2.) The Housing Commission operates several housing developments, each of which has a community room. (*Id.* at ¶ 3.) The Housing Commission controls access to the community rooms, and keeps them locked when they are

not in use. (*Id.*) The Housing Commission allows residents to use the rooms for private parties and other events, and the Housing Commission staff uses the community room to conduct meetings and put on events for residents. (*Id.* at ¶¶4-5.) In addition, the Housing Commission allows outside groups to use the community rooms "so long as the purpose is to benefit the residents of the [Housing Commission] facility." (*Id.* at ¶6.) The Housing Commission does not, however, allow outside groups to use the community room for "religious worship, services, or programs." (*Id.* at ¶8.)

The Housing Commission has permitted outside groups to use its community rooms for a variety of activities aimed at benefitting residents. Outside groups have used the community rooms to provide activities for children, including Boy Scouts and Girl Scouts meetings, tutoring, and programs aimed at character-building and teaching of life principles. (Dkt. #22-1.) For example, a Lansing church sponsors a program called "Powerhouse," which uses the "Character First" program to teach character-building. (Dkt. #21-1.) The program omits faith-based teachings and biblical references. (*Id.*) Youth Haven sponsors a "Kids Klub," which "focus[es] on teaching life principles and building the children's self-esteem through lessons, games, activities, and crafts." (Dkt. #20-1 at Page ID#554.) Similarly, the "Champions Club" has used the community rooms to teach children to "say no to negative peer pressure, to make the right choices and change their community for the better." (Dkt. #20-1 at Page ID#558.) Groups also use the community rooms to provide educational programs for adult residents related to health, financial literacy, and drug abuse prevention. (Dkt. #15-2 at Page ID#490-91, ¶7.) Finally, some groups use the community rooms to provide free food and diapers to residents. (*Id.*)

Dr. Eleanor Kue, a medical doctor, is the pastor of the Church. (Dkt. #11-2 at Page ID#305, ¶3.) During the week, Dr. Kue operates His Healing Medical Clinic, which provides medical services to an underserved community in Lansing. (*Id.* at ¶4.) On Sundays, Dr. Kue conducts "religious meetings," that serve the Housing Commission's residents. (*Id.* at ¶5.) Those meetings consist of Biblical teaching, including teaching related to morality, religious worship, and the provision of a

2

meal. (Dkt. #11-2 at Page ID#306, ¶10.) The Church focuses on teaching children and their families "empowerment through Christ to turn away from the negative community cycles that face them, and to turn . . . toward a lifestyle that contains promise and Hope for the future." (Dkt. #15-6 at Page ID#513.)

In late August and early September 2015, Dr. Kue asked the managers of two different complexes operated by the Housing Commission if she could use their community rooms for the Church's Sunday religious meetings. (*Id.* at ¶¶6, 9.) The manager for one complex told Dr. Kue that she could use the community room to feed residents, but that she could not "say anything about Jesus" or "bring any Bibles." (*Id.* at ¶ 9.) A staff member at that complex later told Dr. Kue that the Church could not use the community room at all because it could not be used for religious activities. (*Id.*)

The managers of the housing complexes at issue have confirmed that they told Dr. Kue that "[the Housing Commission] does not grant access to the community room for religious purposes." (Dkt. #15-3 at Page ID#496, ¶8; dkt. #15-4 at Page ID#499, ¶7.) The managers stated that Dr. Kue could use the community rooms "if the purpose of the access is for the secular benefit of the housing facility's residents," but that "[the Housing Commission] does not allow access to its housing facilities' private community rooms for churches to conduct religious worship, services, or programs." (Dkt. #15-3 at Page ID#496, ¶ 9; dkt. #15-4 at Page ID#500, ¶8.)

Following unsuccessful attempts to convince the Housing Commission to reconsider its decision, the Church filed this action. Shortly thereafter, the Church moved for a preliminary injunction.

### *Legal Standard*

A preliminary injunction is an "extraordinary remedy" that is warranted only upon a clear showing that the movant is entitled to relief. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S.

7, 22, 129 S. Ct. 365, 376 (2008).  A plaintiff seeking a preliminary injunction must demonstrate that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Id.* at 20, 129 S. Ct. at 374.

"[W]hen First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights."  *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir.2002).  "With regard to the factor of irreparable injury, for example, it is well-settled that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690 (1976) (plurality opinion)).  Thus, "in the First Amendment context, the other factors are essentially encompassed by the analysis of the movant's likelihood of success on the merits."  *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 890 (6th Cir. 2012).

## *Discussion*

The Church argues that its exclusion from the Housing Commission's community rooms violates the First Amendment's freedom of speech, free exercise, and establishment clauses.  The Church further argues that such action violates its rights under the Equal Protection Clause.  Because the Court concludes that the Housing Commission has violated the Church's First Amendment right to freedom of speech, it need not consider the Church's other arguments.

To determine whether a speech restriction on publicly-owned property is compatible with the First Amendment, courts consider: "(1) whether the speech is protected under the First Amendment; (2) what type of forum is at issue and, therefore, what constitutional standard applies; (3) whether the restriction on speech in question satisfies the constitutional standard for the forum."  *Miller v. City*

*of Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010).[1]  The Housing Commission does not appear to dispute that the speech at issue falls within the First Amendment's protections.  *See Widmar v. Vincent*, 454 U.S. 263, 269, 102 S. Ct. 269, 274 (1981) ("[R]eligious worship and discussion . . . are forms of speech and association protected by the First Amendment.").  Thus, the first issue the Court must determine is the type of forum involved.

**1.     Type of Forum**

The Supreme Court has recognized three types of public fora: the traditional public forum, the designated public forum, and the limited public forum.  *See Pleasant Grove City v. Summum*, 555 U.S. 460, 469-70, 129 S.Ct. 1125, 1132 (2009).  A traditional public forum is one which by tradition or government mandate has "been devoted to assembly and debate, such as a street or park."  *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001) (internal quotation marks omitted).  "The government creates a designated public forum when it opens a piece of public property to the public at large, treating as if it were a traditional public forum."  *Miller*, 622 F.3d at 534.  Government restrictions based on the content of speech in traditional and designated public fora are subject to strict scrutiny analysis.  *Pleasant Grove*, 555 U.S. at 469-70, 129 S. Ct. at 1132.

A limited public forum is distinct from a traditional or designated public forum.  *Miller*, 622 F.3d at 535 n. 1.  As the Sixth Circuit has explained, "a government entity may 'create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects.'"  *Miller*, 622 F.3d at 534-35 (quoting *Pleasant Grove*, 555 U.S. at 470, 129 S. Ct. at 1132). "When the State establishes a limited public forum, the State is not required to and does not allow persons to engage

---

[1] The Supreme Court's recent decision holding that "[c]ontent-based laws" are subject to strict scrutiny, *Reed v. Gilbert*, 135 S. Ct. 2218, 2226 (2015), does not change the forum-based analysis applicable in this case.  *Reed* addressed "laws" that restrict speech, rather than restrictions that the government imposes in its role as a property owner. As the Court has previously held, "[w]here the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject*."  Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S. Ct. 2701, 2705 (1992).  Thus, because the case at issue concerns the Housing Commission's restriction on the use of its property, rather than any use of legislative power, the Court will employ a "forum based" analysis.  *See id.*

in every type of speech." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106, 121 S. Ct. 2093, 2100 (2001).  The State's power to restrict speech in a limited forum is not, however, unlimited.  *Id.*  Any such restriction "must not discriminate against speech on the basis of viewpoint, and the restriction must be reasonable in light of the purpose served by the forum." *Id.* at 106-07, 121 S. Ct. at 2100 (internal citations and quotation marks omitted).

"A nonpublic forum, in contrast, is a government-owned property that is not by tradition or governmental designation a forum for public communication."  *Miller*, 622 F.3d at 534 (internal quotation marks omitted).  For a nonpublic forum, the government may limit access "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."  *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir. 2007) (internal quotation marks omitted).  In determining whether a forum is some type of public forum or a non-public forum, the Sixth Circuit focuses on "whether the government intentionally opened the forum for public discourse."  *Am. Freedom*, 698 F.3d at 890.  Such analysis includes "not only . . . . the government's explicit statements, policy, and practice, but also the nature of the property and its compatibility with expressive activity to discern the government's intent."  *Id.* (internal citations and quotation marks omitted).

The Church argues that the community rooms are either traditional or designated public fora because "no community groups are excluded except based on the religious content of their meetings." (Dkt. #11, Page ID#288.)  That assertion, however, is belied by the record.  The affidavits from the Housing Commission state that community groups may be granted access to the community rooms "so long as the purpose is to benefit the residents at the [Housing Commission] facility" (dkt. #15-2 at Page ID#489, ¶6), and there is no evidence that the rooms have been used beyond that purpose.  Thus, the Housing Commission has not "open[ed] [the community rooms] to the public at large, treating [them] as if [they] were [] traditional public for[a]." *Miller*, 622 F.3d at 534.  Rather, the

6

Housing Commission has opened the rooms to outside groups for the limited purpose of hosting events that benefit the residents. Accordingly, the community rooms do not constitute traditional or designated public fora. *See Miller*, 622 F.3d at 535 (concluding that opening up Cincinnati's city hall to certain private groups did not transform it into a traditional or designated public forum because it was not open to public discourse).

The question thus becomes whether the community rooms are limited public fora or nonpublic fora. In distinguishing between the two, courts look to "whether the government intended to open the forum at issue." *Kincaid*, 236 F.3d at 348-49. To determine the government's intent, the Sixth Circuit instructs courts to "look to the government's policy and practice with respect to the forum, as well as to the nature of the property at issue and its 'compatibility with expressive activity.'" *Id.* at 349 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S. Ct. 3439, 3449 (1985)). The context in which the forum is found is also relevant to the determination. *Id.*

Courts that have completed the forum analysis with regard to rooms in public housing complexes have reached different results. The Eleventh Circuit previously held that the auditorium of a public housing development was a limited public forum because management had opened the space "to a wide range of expressive activities, including ceramics classes, political speeches, and religious services," but that the library was a nonpublic forum because there was no evidence that "tenants regularly or frequently met in the library." *Crowder v. Hous. Auth. of City of Atlanta*, 990 F.2d 586, 591 (11th Cir. 1993). A district court reached a different conclusion in *Concerned Residents of Taylor-Wythe v. New York City Hous. Auth.*, No. 96 CIV. 2349 (RWS), 1996 WL 452432 (S.D.N.Y. Aug. 9, 1996), finding that a community center was a nonpublic forum because the primary purpose was to provide a space for residents' recreation, and that the housing authority had "sharply limited use of the Center by outside groups both in policy and in practice." *Id.* at *5.

7

Finally, another district court concluded that a community room represented a nonpublic forum at times and a limited public forum at other times. *See Daily v. New York City Hous. Auth.*, 221 F. Supp. 2d 390, 400 (E.D.N.Y. 2002).

The question of whether the community rooms are limited public or nonpublic fora is a close one, but it is one the Court need not answer. Regardless of how the community rooms are classified, "the result would be the same, because government limitations on speech in both a limited public forum and a nonpublic forum receive the same level of scrutiny." *Miller*, 622 F.3d at 535-356. Any restrictions on speech imposed by the Housing Commission must be "reasonable and viewpoint neutral," whether the community rooms are deemed limited public or nonpublic fora. *Id.* at 536.

**2.     Application of Constitutional Standard**

The Housing Commission's restrictions on use of the community rooms "must not discriminate against speech on the basis of viewpoint, and . . . must be reasonable in light of the purpose served by the forum." *Good News Club*, 533 U.S. at 106-07, 121 S. Ct. at 2100 (internal quotation marks omitted). The Church argues that the Housing Commission engaged in viewpoint discrimination when it excluded the Church based on the religious nature of its speech. The Housing Commission argues that its restriction is viewpoint neutral because it does not allow any church to use its community room as a house of worship. As the Housing Commission explains, it "is not picking and choosing which religious worship to 'approve'—no religious worship is permitted, regardless of the religion." (Dkt. #15 at Page ID#480.)   The Supreme Court's decision in *Good News Club* forms the basis of the Court's analysis of the parties' arguments.

In *Good News Club*, a Christian organization geared toward children, the Good News Club, requested permission from a public school to use space in the building after hours to sing songs, read Bible lessons, and memorize scripture. *Id.* at 103, 121 S. Ct. at 2098. The school district's policy allowed school facilities to be used for "social, civic and recreational meeting and entertainment

8

events, and other uses pertaining to the welfare of the community," but specifically prohibited use "by any individual or organization for religious purposes." *Id.* at 102-103, 121 S. Ct. at 2098. Based on that policy, the school district denied the Good News Club's request. *Id.* at 103, 121 S. Ct. at 2098.

Applying the standard for a limited forum, the Court concluded that the school's exclusion of the Good News Club constituted unconstitutional viewpoint discrimination. *Id.* at 109, 121 S. Ct. at 2101. The Court explained the Club intended to teach morals and character development to children, that the policy allowed such activities generally, and that the exclusion of the Club based on the religious basis for their lessons constituted viewpoint discrimination. *Id.* at 108-109, 121 S. Ct. at 2100-2101. The Court rejected the idea that, by characterizing the activities as religious in nature, the school could treat the Good News Club's activities differently than other similar activities. *Id.* at 111, 121 S. Ct. at 2102. The Court explained:

> We disagree that something that is "quintessentially religious" or "decidedly religious in nature" cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint. What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons. . . [S]peech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint. Thus, we conclude that [the school's] exclusion of the Club from use of the school, pursuant to its community use policy, constitutes impermissible viewpoint discrimination.

*Id.* at 111-12, 121 S. Ct. at 2102 (internal citations omitted).

There is little relevant distinction between the facts at issue in this case and those in *Good News Club*. The Housing Commission allows outside groups to use the community rooms "so long as the purpose is to benefit the residents at the [Housing Commission] facility," and has permitted programs aimed at character-building, teaching life principles, and empowering children to make good choices. Thus, like the school at issue in *Good News Club*, the Housing Commission allows the community rooms to be used for the teaching of moral and character development.

9

Those same lessons are central in the Church's religious meetings. The meetings focus on teaching moral lessons and empowering children and their families to break negative cycles and make good life choices. Thus, the content of the meetings is similar to that which has been permitted by the Housing Commission, with one important distinction—the Church's lessons are based on a religious foundation. The Housing Commission's affidavits make clear that it was this distinction that motivated the decision to deny the Church's request to use the community rooms, and that the decision would be different if the Church intended to use the rooms "for the secular benefit" of the Housing Commission's residents. As *Good News Club* makes clear, however, restricting speech based on its religious nature constitutes impermissible viewpoint discrimination.

The fact that the Church intended to include worship as part of its religious meetings does not change the analysis in this case. As previously noted, the Housing Commission's affidavit makes clear that it refused the Church's request because "[the Housing Commission] does not grant access to the community room for religious purposes," and has a policy excluding "religious worship, *services, or programs*." (Dkt. #15-3 at Page ID#495-96, ¶¶6, 8 (emphasis added).) Thus, it was the religious viewpoint of the Church's meetings—rather than the fact that worship would be included—that formed the basis of the Housing Commission's decision to exclude the Church . In other words, the Housing Commission did not examine the content of the proposed meetings, but based its decision to exclude the Church solely on the religious viewpoint espoused.

Moreover, the Church 's religious meetings include not only religious worship, but also biblically based lessons regarding morality and life skills. Thus, like the activities at issue in *Good News Club*, the Church's meetings "do not constitute mere religious worship, divorced from any teaching of moral values." *Good News Club*, 533 U.S. at 112 n.4, 121 S. Ct. at 2102 n.4. Rather, the meetings include religious worship as part of a program that includes singing, games, and lessons about morality. No matter what label the Housing Commission applies to the meetings, "what

10

matters is the substance of [the Church's] activities," which are materially indistinguishable from those at issue in *Good News Club*. *Id.*

For those reasons, the decisions of courts in other circuits upholding the exclusion of worship services are distinguishable from the facts of this case. *See Bronx Household of Faith v. Bd. of Educ. of City of New York*, 650 F.3d 30 (2d Cir. 2011); *Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891 (9th Cir. 2007) *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365 (2008). In *Faith Center*, the Ninth Circuit held that a public library's exclusion of worship services was a "permissible limitation on the subject matter that may be discussed" in the forum, and thus did not constitute viewpoint discrimination. *Faith Ctr.*, 480 F.3d at 911. The court explained:

> Pure religious worship . . . is not a secular activity that conveys a religious viewpoint on otherwise permissible subject matter. For every other topic of discussion that Faith Center engages in—the Bible, communication, social and political issues, life experiences—religious and non-religious perspectives exist. The same can be said for moral and character development in *Good News Club* . . . Religious worship, on the other hand, is not a viewpoint but a category of discussion within which many different religious perspectives abound.

*Id.* at 915. The court acknowledged that it was not competent to distinguish between "pure religious worship" and other forms of religious speech, but explained that the plaintiff had made such distinction itself when it requested the forum for "praise and worship." *Id.* at 918. Thus, the court held that the exclusion of worship services was permissible.

In *Bronx Household*, the Second Circuit addressed the denial of the plaintiff's request to hold "Christian worship services" in a school facility. *Bronx Household*, 650 F.3d at 35. That denial was based on a policy that allowed school facilities to be used after-hours for many purposes, but specifically excluded "religious worship services." *Id.* at 34-35. The court held that the rule did not constitute viewpoint discrimination, explaining:

> The conduct of religious worship services, which the rule excludes, is something quite different from free expression of a religious point of view, which the Board does not

11

> prohibit. The conduct of services is the performance of an event or activity. While the conduct of religious services undoubtedly *includes* expressions of a religious point of view, it is not the expression of that point of view that is prohibited by the rule. Prayer, religious instruction, expression of devotion to God, and the singing of hymns, whether done by a person or a group, do not constitute the conduct of worship services. Those activities are not excluded. . . . The "religious worship services" clause does not purport to prohibit use of the facility by a person or group of persons for "worship." What is prohibited by this clause is solely the conduct of a particular type of event: a collective activity characteristically done according to an order prescribed by and under the auspices of an organized religion, typically but not necessarily conducted by an ordained official of the religion.

*Id.* at 36-37.  The court went on to explain that the exclusion was reasonable in light of the purpose of the forum, and thus passed constitutional muster.  *Id.* at 40.

In this case, the Court need not answer the difficult questions posed in *Faith Center* and *Bronx Household*.  The Housing Commission denied the Church's request to hold its meetings in the community rooms not because they were deemed worship services, but because they were intended to express a religious viewpoint.  Moreover, the decisions in *Faith Center* and *Bronx Household* were based, in large part, on the plaintiffs' characterization of their activities as worship services.  Unlike the plaintiffs in those cases, however, the Church has never characterized its Sunday meetings as pure worship.  Although the Church acknowledges that worship is included in the meetings, it has emphasized that the meetings go beyond that, and the Court has no basis to question that.  As the Supreme Court explained, "there is no indication when 'singing hymns, reading scripture, and teaching biblical principles'" cease being speech about religion and become worship.  *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 845, 115 S. Ct. 2510, 2524 (1995).  In other words, while "[r]eligious worship services can be distinguished from other forms of religious speech by the adherents themselves," *Faith Ctr.*, 480 F.3d at 918, this Court is not competent to make such distinctions.

The Housing Commission allows outside groups to use its community rooms for activities intended to benefit the residents of the Housing Commission's facilities, but only if those activities

are, in the opinion of the Housing Commission, of a secular nature. The Housing Commission denied the Church's request to use its community rooms for religious meetings pursuant to its policy of excluding activities that have a religious purpose. In doing so, the Housing Commission engaged in impermissible viewpoint discrimination and violated the Church's First Amendment free speech rights.

### *Conclusion*

For the reasons discussed in this Opinion, the Court concludes that the Church is likely to succeed on the merits of its claim under the Free Speech Clause.[2] Accordingly, the Court will preliminarily enjoin the Housing Commission from denying the Church access to the community rooms for its religious meetings. An Order consistent with this Opinion shall follow.

Dated: February 1, 2016                         /s/ Gordon J. Quist
                                            GORDON J. QUIST
                                        UNITED STATES DISTRICT JUDGE

---

[2] The Court's conclusion is based on the fact that the Housing Commission denied the Church's request to use its community rooms because the proposed meetings were religious in nature. There is no evidence in the record that the Housing Commission denied the request based on an exclusion for worship services specifically, or that the Church seeks to use the community rooms for a pure worship service. Thus, the Court offers no opinion on whether the Housing Commission could exclude worship services without violating the Constitution.