UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

HIS HEALING HANDS CHURCH,

    Plaintiff,

v.                                              Case No. 1:15-CV-1059

LANSING HOUSING COMMISSION,         HON. GORDON J. QUIST

    Defendant.
_____/

## OPINION REGARDING CROSS MOTIONS
## FOR SUMMARY JUDGMENT

Plaintiff, His Healing Hands Church, filed a complaint pursuant to 42 U.S.C. § 1983 against Defendant, the Lansing Housing Commission, alleging violations of the First Amendment and the Equal Protection Clause. The Church alleges that the Housing Commission violated the Church's rights by refusing its requests to use the Housing Commission's community rooms for its Sunday meetings. The Housing Commission denied the Church's request because the Church's programs violate the Housing Commission's policy against use of its community rooms for religious purposes. The parties have filed cross-motions for summary judgment, and the Court heard oral argument on January 17, 2017.

For the reasons set forth below, the Court will grant the Church's motion for summary judgment, deny the Housing Commission's motion for summary judgment, and enter a permanent injunction barring enforcement of the Housing Commission's policy prohibiting the Church from presenting its programs in Housing Commission facilities.

### I. BACKGROUND

The Church filed its complaint in this case on October 14, 2015, and, shortly thereafter, filed a motion for a preliminary injunction. The Court held a hearing on the motion for preliminary

injunction on January 19, 2016, and issued an Opinion and Order on February 1, 2016, granting the Church's motion. *His Healing Hands Church v. Lansing Hous. Comm'n*, 160 F. Supp. 3d 1014 (W.D. Mich. 2016). The pertinent facts were set forth in the February 1, 2016, Opinion:

> The Housing Commission is a public housing authority that provides subsidized housing to qualified individuals and families. (Dkt. #15-2 at Page ID#489, ¶2.) The Housing Commission operates several housing developments, each of which has a community room. (*Id.* at ¶ 3.) The Housing Commission controls access to the community rooms, and keeps them locked when they are not in use. (*Id.*) The Housing Commission allows residents to use the rooms for private parties and other events, and the Housing Commission staff uses the community room to conduct meetings and put on events for residents. (*Id.* at ¶¶4-5.) In addition, the Housing Commission allows outside groups to use the community rooms "so long as the purpose is to benefit the residents of the [Housing Commission] facility." (*Id.* at ¶6.) The Housing Commission does not, however, allow outside groups to use the community room for "religious worship, services, or programs." (*Id.* at ¶8.)
>
> The Housing Commission has permitted outside groups to use its community rooms for a variety of activities aimed at benefitting residents. Outside groups have used the community rooms to provide activities for children, including Boy Scouts and Girl Scouts meetings, tutoring, and programs aimed at character-building and teaching of life principles. (Dkt. #22-1.) For example, a Lansing church sponsors a program called "Powerhouse," which uses the "Character First" program to teach character-building. (Dkt. #21-1.) The program omits faith-based teachings and biblical references. (*Id.*) Youth Haven sponsors a "Kids Klub," which "focus[es] on teaching life principles and building the children's self-esteem through lessons, games, activities, and crafts." (Dkt. #20-1 at Page ID#554.) Similarly, the "Champions Club" has used the community rooms to teach children to "say no to negative peer pressure, to make the right choices and change their community for the better." (Dkt. #20-1 at Page ID#558.) Groups also use the community rooms to provide educational programs for adult residents related to health, financial literacy, and drug abuse prevention. (Dkt. #15-2 at Page ID#490-91, ¶7.) Finally, some groups use the community rooms to provide free food and diapers to residents. (*Id.*)
>
> Dr. Eleanor Kue, a medical doctor, is the pastor of the Church. (Dkt. #11-2 at Page ID#305, ¶3.) During the week, Dr. Kue operates His Healing [Hands] Medical Clinic, which provides medical services to an underserved community in Lansing. (*Id.* at ¶4.) On Sundays, Dr. Kue conducts "religious meetings," that serve the Housing Commission's residents. (*Id.* at ¶5.) Those meetings consist of Biblical teaching, including teaching related to morality, religious worship, and the provision of a meal. (Dkt. #11-2 at Page ID#306, ¶10.) The Church focuses on teaching children and their families "empowerment through Christ to turn away from the negative community cycles that face them, and to turn . . . toward a lifestyle that contains promise and Hope for the future." (Dkt. #15-6 at Page ID#513.)

2

> In late August and early September 2015, Dr. Kue asked the managers of two different complexes operated by the Housing Commission if she could use their community rooms for the Church's Sunday religious meetings. (*Id.* at ¶¶6, 9.) The manager for one complex told Dr. Kue that she could use the community room to feed residents, but that she could not "say anything about Jesus" or "bring any Bibles." (*Id.* at ¶ 9.) A staff member at that complex later told Dr. Kue that the Church could not use the community room at all because it could not be used for religious activities. (*Id.*)
>
> The managers of the housing complexes at issue have confirmed that they told Dr. Kue that "[the Housing Commission] does not grant access to the community room for religious purposes." (Dkt. #15-3 at Page ID#496, ¶8; dkt. #15-4 at Page ID#499, ¶7.) The managers stated that Dr. Kue could use the community rooms "if the purpose of the access is for the secular benefit of the housing facility's residents," but that "[the Housing Commission] does not allow access to its housing facilities' private community rooms for churches to conduct religious worship, services, or programs." (Dkt. #15-3 at Page ID#496, ¶ 9; dkt. #15-4 at Page ID#500, ¶8.)

*Id.* at 1016–18.

Following the issuance of the preliminary injunction, the parties engaged in discovery. Although the additional facts presented in instant motions add little that is new to, or changes, the analysis in this case, they provide further specifics about events before and after the preliminary injunction:

1. The Housing Commission operates four public housing facilities: the Hildebrandt facility, the LaRoy Froh facility, the South Washington facility and the Mt. Vernon facility. (ECF No. 53-2 at PageID.1827.) The Church initially sought to use the community rooms at the Hildebrant and LaRoy Froh facilities. Since the entry of the preliminary injunction, the Church has used both of those facilities on Sundays on almost a weekly basis and, with the Housing Commission's permission, expanded its programs to the South Washington and Mt. Vernon facilities on a few days for vacation Bible school events. (*Id.* at 1828.)

2. The Church actually requested permission from the Housing Commission to use community rooms twice. First, in March 2015, Dr. Kue asked Rhonda Pagel, then-manager of the Hildebrant facility, about using the community rooms for the Church's religious meetings. Pagel rejected the request, telling Dr. Kue that "LHC does not grant access to the community room for religious purposes." (ECF No. 15-3 at PageID.496.) Although Pagel told Dr. Kue that the Church could use the room to feed people, she denies telling Dr. Kue that the Church could not mention Jesus and they could not bring their Bibles. (ECF No. 53-6 at PageID.1893.) However, Pagel admitted that under the Housing Commission's policy, an outside group could not teach about Jesus in, or bring Bibles to, the community room, (*id.* at

3

       PageID.1893–94), and she admitted that the Church's request was denied solely because the Church's program was religious. (*Id.* at PageID.1889–90.) The Church applied again to use the Hildebrant community room in late summer 2015, but its request was rejected because the program was religious. In addition, Dr. Kue met with LaRoy Froh's Manager, Lisa Parsons, who rejected the request because she considered the program a "church service." (ECF No. 53-9 at PageID.1916.)

3. After the Church's first request was denied, it purchased a trailer with a dropdown platform and an electrical apparatus that permitted the Church to use its sound and video systems. The Church used the trailer to conduct outdoor services near the Hildebrandt and LaRoy Froh facilities. (ECF No. 53-3 at PageID.1837.) In addition, the Church had to purchase a trailer hitch and additional gas in an amount exceeding the $10.00 in compensatory damages it seeks. (ECF No. 53-11.) Eventually, due to the cold weather, the Church could not conduct its programs outdoors.

4. The Housing Commission's procedures/regulations permit outside groups to use community rooms for a variety of "secular" recreational and educational or human/social services, but prohibit all "[r]eligious service/programs." (ECF No. 53-25.)

5. Non-resident groups may present speakers, show movies, and share stories with the residents, so long as the subjects presented are of a secular nature. (ECF No. 53-6 at PageID.1885–87.) Rhonda Pagel, the manager of the Hildebrandt facility, testified that a group such as the Boy Scouts would be permitted to teach residents to say no to drugs, to say no to negative peer pressure, to respect authority, and to be accountable, but a group could not teach these topics from a religious perspective or as part of a religious program. (*Id.* at PageID.1887–88.)[1]

## II. MOTION STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty*

---

[1] The Housing Commission disputes the Church's assertion that the Boy Scouts and the Girl Scouts use the community rooms. However, in support of its motion for preliminary injunction, the Church offered the Housing Commission's community use calendar and provided a usage summary for frequent users based on the entries in the community use calendar. The summary shows that Boy Scouts or Girl Scouts used the community rooms 41 times. (ECF No. 22-1 at PageID.568.) The Housing Commission provides no evidence to explain why its own use calendar—indicating that both the Boy Scouts and the Girl Scouts have previously used the community rooms—is wrong or inaccurate. Even if the Boy Scouts or the Girl Scouts are not presently using the rooms, the fact remains that they apparently used them at some point. Moreover, whether they even used them at all is immaterial, as the Housing Commission admits that those groups would be allowed to use the community rooms. In addition, the Housing Commission does not dispute that other groups, such as the Champions Club (a church-sponsored kids club) have used the community rooms to teach topics such as character development and moral values.

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### III.  DISCUSSION

In its prior Opinion regarding the Church's motion for a preliminary injunction, the Court rejected the Church's argument that the Housing Commission's community rooms constitute either traditional or designated public fora, because the community rooms are not open to the public at large, but instead are opened only to those outside groups that "host[] events that benefit the residents." *His Healing Hands Church*, 160 F. Supp. 3d at 1020.  The Court also concluded that it was unnecessary to decide weather the community rooms are properly characterized as limited public fora or nonpublic fora because the limitations that the Housing Commission could impose on speech are the same regardless of the type of forum: they must be "'reasonable and viewpoint neutral.'" *Id.*  (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 536 (6th Cir. 2010)).  As for the validity of the Housing Commission's restrictions on religious activity, the Court found "little relevant distinction between the facts at issue in this case and those in *Good News Club* [*v. Milford Central School*, 533 U.S. 98, 121 S. Ct. 2093 (2001)]."  The Court reasoned that the Housing Commission's policy of allowing outside groups to offer programs that benefit the facilities' residents through the teaching of moral and character development, while excluding the Church from teaching such topics from a religious perspective through Bible readings, singing, games, and biblically-based lessons on morality and life skills, constituted viewpoint discrimination that is

5

indistinguishable from the viewpoint discrimination the Supreme Court held impermissible in *Good News Club*. *Id.* at 1021–22. The fact that the Church's meetings include religious worship did not change the analysis because the Church's program also includes other elements that made the Church's activities "materially indistinguishable from those at issue in *Good News Club*." *Id.* at 1022. Finally, because the Housing Commission did not deny the Church permission to use the community rooms on the ground that the Church's meetings were deemed worship services, and the Church never characterized its Sunday meetings as pure worship, the Court declined to distinguish between worship and expression of a religious viewpoint. *Id.* at 1023–24.

The parties' instant motions and supporting materials essentially repeat the prior facts and arguments the Court addressed in its preliminary injunction Opinion. Moreover, the Court finds no genuine issue of material fact that precludes entry of summary judgment.[2] Therefore, the Court need not repeat its analysis; *Good News Club* still dictates the analysis regardless of the type of forum because the Housing Commission's policy constitutes impermissible viewpoint discrimination. However, the Court will address the additional arguments the Housing Commission presents in its briefs.

A.   **The Housing Commission's Arguments**

   1.   **Exclusion of all Religious Viewpoints**

The Housing Commission argues that its policy is viewpoint neutral because it excludes all religious groups that seek to use the community rooms for religious purposes, worship, or activities and thus does not favor one religious group over another. This argument misses the point. Whether a rule excludes one religious group or all religions from discussing an otherwise permissible topic solely because of a religious perspective is irrelevant; under either circumstance, the rule fosters

---

[2]The Housing Commission argues that Dr. Kue's prior affidavits rely on hearsay that may not be considered in deciding a summary judgment motion. However, the Church does not rely on Dr. Kue's prior affidavits, but instead cites the usage history and other documents, which are confirmed by the affidavits and testimony of Housing Commission officials, which show that Dr. Kue's statements in her prior affidavits were accurate.

viewpoint discrimination. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393, 113 S. Ct. 2141, 2147 (1993) ("That all religions and all uses for religious purposes are treated alike . . . does not answer the critical question whether it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint."). Thus, the fact that the Housing Commission precludes all religious organizations from using its community rooms to present otherwise permissible programming from a religious perspective does not render the Housing Commission's rule any less discriminatory. *See Lister v. Defense Logistics Agency*, 482 F. Supp. 2d 1003, 1009 (S.D. Ohio 2007) ("Fundamentally, the Supreme Court has determined that a regulation which excludes all religions, while advancing or permitting advocacy of non-religious associations, violates the First Amendment."); *Tong v. Chi. Park Dist.*, 316 F. Supp. 2d 645, 657 (N.D. Ill. 2004) (rejecting the defendant's argument that its policy, which prohibited all text that endorsed religion or a specific religious belief, did not discriminate on the basis of viewpoint because "the question is whether a speaker is prevented from making a statement from a religious perspective that other speakers are free to address").[3]

The Housing Commission argues that if it cannot exclude all religious groups and must allow the Church to use its community rooms, it would also be required to allow groups like the Ku Klux Klan or a radical Islam group to use the community rooms. This argument lacks merit. First because there is no evidence that any such group has requested permission to use the community rooms, the Housing Commission's theoretical concerns may never materialize. More importantly,

---

[3]Although the Housing Commission argues that it may preclude outside groups from using the community rooms as "houses of worship," there is no indication that the Church's programming, which includes elements commonly used by other outside groups, *i.e.*, teaching participants to turn away from negative community influences—such as illegal drug use—that they confront, is pure worship. Moreover, even if some elements of the Church's programming (singing and teaching from the Bible) are elements of a religious service, such is no basis to conclude that the Church is engaging in worship because such elements may simply "convey[] a religious perspective on otherwise permissible subject matter." *Citizens for Cmty. Values, Inc. v. Upper Arlington Pub. Library Bd. of Trs.*, No. C-2-08-223, 2008 WL 3843579, at *12 (S.D. Ohio Aug. 14, 2008).

7

the Housing Commission cites no authority sanctioning the exclusion of all members of a group simply because some members might express offensive or distasteful views. As the Church points out, such a policy would be just as unconstitutional as a policy that excludes all persons of a certain race or ethnicity out of fear that some persons of that race or ethnicity might express an offensive viewpoint.

### 2. The Public vs. Private Facility Argument

The Housing Commission argues that *Good News Club*, *Lamb's Chapel*, and *Widmar v. Vincent*, 454 U.S. 263, 102 S. Ct. 269 (1981), are distinguishable from the instant case because the facilities at issue in those cases were public in nature, while the Housing Commission's community rooms are private facilities. This argument ignores the fact that the Housing Commission opens the community rooms to any outside group to speak on any topic that benefits the residents of the housing facilities, just as, for example, the school in *Good News Club* opened its building to members of the public for specified uses. Even if the community rooms are nonpublic fora, exclusion of any group on the basis of a religious viewpoint still violates the Free Speech clause.[4]

### 3. The Presence of Nonresidents

The Housing Commission argues that because Dr. Kue testified that nonresident children are brought in to attend the meetings, the Church is using the community rooms to benefit nonresidents. This argument lacks merit— even if nonresidents do benefit from attending the meetings. First, in an affidavit, Dr. Kue confirms that the nonresidents who attend the meetings provide important benefits to residents by, among other things, assisting with teaching and supervising, serving food, and helping to set up and take down equipment. (ECF No. 45-1 at PageID.1320.) The Housing

---

[4] The Housing Commission's reliance on *La Vean v. Randall*, No. 1:04-CV-188, 2005 WL 2405957 (W.D. Mich. Sept. 29, 2005), is misplaced. *La Vean* is distinguishable from the instant base because in *La Vean* the plaintiff sought access to "controlled access or 'secured entry' residential buildings" for the purpose of engaging in political activity. *Id.* at *6. *La Vean* did not involve use of community rooms that were open to outside groups to provide programs to benefit the residents.

Commission offers no evidence to the contrary. Second, the Housing Commission's own rules anticipate that guests are allowed in the community rooms. As the Housing Commission's counsel conceded when asked by Magistrate Judge Green at the August 11, 2016, discovery hearing, the Housing Commission's rules permit events such as baby showers for residents in the community rooms, and nonresidents who attend benefit from attending. (ECF No. 54-2 at PageID.2107.) Thus, the fact that outside guests also benefit from attending the Church's meetings in the community rooms is no reason to exclude the Church. As the Housing Commission's counsel conceded, there is no rule specifying a minimum number of residents who must benefit from the event.[5] (*Id.* at PageID.2105–06.)

### 4. The Housing Commission's Right to Deny Use for any Reason

In its brief in response to the Church's motion, the Housing Commission argues that it retains the right to deny use of its community rooms for any reason. However, the Housing Commission does not identify any written guidelines or rules that cabin its discretion. The law is clear that unwritten policies or practices lacking objective standards are particularly susceptible to constitutional attack because they afford the decisionmaker "limitless discretion." *Niemotko v. Maryland*, 340 U.S. 268, 271–72, 71 S. Ct. 325, 327 (1951). Given the absence of any objective standard governing the asserted discretion, the Housing Commission may not rely on such discretion to preclude the Church from using the community rooms.

### B. The Church's Alternative Claims

The Church also argues that the Housing Commission's policy violates the Free Exercise Clause, the Church's right to Equal Protection, and the Establishment Clause. Although the Church requests that the Court address each of these claims, having concluded that the Housing Commission

---

[5] The Housing Commission's suggestion that the Church could conduct its meetings at its own property is irrelevant. Even if the Church had the space and the means to transport residents of the housing facilities to the Church's property, such policy would not excuse the Housing Commission's viewpoint discrimination.

violated the Church's free speech rights under the First Amendment, the Court need not reach the Church's remaining claims. *See Curry ex rel. Curry v. Sch. Dist. of the City of Saginaw*, 452 F. Supp. 2d 723, 741 (E.D. Mich. 2006).

**C.     Relief**

As relief for the constitutional violation, the Church requests a permanent injunction that, among other things, enjoins the Housing Commission from denying the Church use of its community rooms on the basis of the religious viewpoint or content of the Church's meetings, requires the Housing Commission to make the community rooms available to the Church on the same basis the community rooms are made available to other community groups or individuals, and requires the Housing Commission to amend or revise its policy to delete the prohibition on religious services/programs. In addition, the Church requests an award of $10.00 in compensatory damages.

"A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 466 F.3d 391, 394 (6th Cir. 2006) (internal quotation marks omitted). "[E]ven minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *United Food & Commercial Workers Union Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998 ) (internal quotation marks omitted). For the reasons set forth above and in the Court's February 1, 2016, Opinion, the Church has shown that the Housing Commission violated the Church's free speech rights. In addition, there is every indication that, absent permanent injunctive relief, the Housing Commission will adhere to its unconstitutional policy of viewpoint discrimination against organizations seeking to present programs on otherwise permissible topics from a religious point of view.

The Housing Commission requests that, if the Court issues injunctive relief, it allow the Housing Commission to at least exclude religious worship. The Court declines this request. As previously noted, there is no indication in this case that the Church's Sunday programs constitute pure worship, and the Housing Commission did not deny the Church's requests to use the community rooms on the basis that the Church's programming is a worship service. Moreover, the Court has previously said that it is not competent to distinguish between religious worship and teaching of morals and character development from a religious point of view.

As for the Church's request for compensatory damages, the Housing Commission neither objects to nor disputes the Church's claim and evidence that it suffered $10.00 in compensatory damages.

### IV. CONCLUSION

For the foregoing reasons, the Court will grant the Church's motion for summary judgment on the Church's claim that the Housing Commission violated the Church's free speech rights under the First Amendment, deny the Housing Commission's motion for summary judgment, and grant the Church appropriate relief.

An Order consistent with this Opinion will enter.


Dated: February 8, 2017                              /s/ Gordon J. Quist
                                                GORDON J. QUIST
                                          UNITED STATES DISTRICT JUDGE